Argued before BARNARD, P. J., and DYKMAN and PRATT, JJ.

Rudd & Hunt, (William P. Fiero, of counsel,) for appellant.

Joseph F. Daly, for respondent.

BARNARD, P. J. The water rates are not taxes. The act under which the defendant was incorporated (chapter 36, Laws 1873) directs the commissioners to establish a scale of rents payable in advance or upon a stated term of credit, to be called "water rents." The board was authorized to cut off the supply of water if these rents were not paid. There is no basis for terming these water rents a "tax." Provident Inst. for Saving v. Jersey City, 113 U. S. 506, 5 Sup. Ct. Rep. 612; Treadwell v. Van Schaick, 30 Barb. 444. The commissioners did fix the rates, and it was supplied and paid for, but under a protest on account of his receiving no notice of the levying of a tax on the land. There is no lien on the land for water furnished and not paid for. There will be a tax on land for a deficiency to meet the purpose of the act, and, when this tax is laid, it will be upon notice. The judgment should be affirmed, with costs. All concur.

---

In re LONG ISLAND WATER SUPPLY CO.

In re CITY OF BROOKLYN.

(Supreme Court, Special Term, Kings County.    April, 1893.)

1. WATER COMPANIES—EXCLUSIVE FRANCHISE.
    Laws 1873, c. 737, provides that, whenever a certain number of persons propose to form a company for the purpose of furnishing a town or village with water, they shall present to certain officers of the town or village an application containing a request that they consider the application to supply said town or village, or the inhabitants thereof, with water, and that, if such officers grant the application, the persons named therein may proceed to organize the company. *Held*, every company organized under such statute exists by virtue of a contract with the town or village, and has an exclusive franchise, for which compensation must be made if it is condemned for public uses.

2. ANNEXATION OF TOWN—EFFECT ON EXISTING CONTRACTS.
    The rights of such water company are not affected by the fact that the town to which it supplies water is annexed to an adjoining city.

Proceeding by the city of Brooklyn, under Laws 1892, c. 481, to condemn the property and franchises of the Long Island Water Supply Company, organized in the town of New Lots, which town was afterwards annexed to the city of Brooklyn by Laws 1886, c. 335. The commissioners to whom the question of compensation was referred reported in favor of the water company for $570,000. The city of Brooklyn moves to confirm the report. Denied.

George G. Reynolds and Albert G. McDonald, for the city of Brooklyn.

William C. DeWitt and Thomas E. Pearsall, for the Long Island Water Supply Co.

PRATT, J. As now presented, this case involves simply a cold question of law. Were the rights of this water company to compensation for its franchises and contract with the town of New Lots mere gratuities, revocable or otherwise destructible at the will of the legislature or the pleasure of the town authorities? Or did they constitute permanent property, which, like any other property, was beyond legislative control except on the fundamental conditions that it must be fairly appraised and paid for before it can be appropriated to municipal use? The majority of the commissioners have reported that, in their opinion, the company's franchise and contract did not give it any exclusive rights to purvey water in the town; that the provisions of the annexation act requiring compensation before the city could extend its mains into this territory did not alter the character of the company's rights, and, because of the assumed power of the legislature to repeal the material provisions of that act, they certify that they have awarded a materially less sum for those rights than they would have awarded if they had believed they were exclusive and permanent during the remainder of the term of the company's franchise. The court, under the act of 1892, has nothing to do with fixing the value of these rights. It must affirm the award if satisfied that it has been made upon correct principles, or set it aside if error is apparent therein; hence the award must be set aside if these rights were exclusive and permanent, because on that hypothesis the valuation is materially inadequate.

Let us note a few points leading up to the main inquiry; they may enable us to present the question more sharply. The function of supplying water in a town, village, or city is not a public function. It is purely a private matter of business. A municipality is not bound, at common law, to furnish water, any more than to supply milk, for its inhabitants. Its power to furnish water is derived wholly by act of the legislature. Even when the power is thus given, its real character is not changed. It still remains a mere private business function. The distinction between the political or governmental functions of a town or city and those which it obtains by its own solicitation is broad and clear,—too clear to excuse debate. It opens streets, establishes police, and attends to education and public health and matters of public concern. In these respects it represents the state, and exercises acts of sovereignty. But when it manages market places, wharves, or piers, and derives an income therefrom, it acts wholly in a private capacity. City of Petersburg v. Applegarth, 28 Grat. 321. The powers of the city to furnish water to its inhabitants or for its own use are therefore of no higher order, nor are they entitled to any greater consideration, than those of this water company; nor are they to be encouraged in any respect because they will be of greater benefit to the consumer. Both are bound to furnish water at the same rates. Hence the question before us is stripped bare of any ideas of benefaction to anybody. It is simply a question whether the city or this company shall enjoy

the business profit of conducting this water business in this territory. It seeks to appropriate the water company's rights simply because it wants them. It has been assumed, erroneously, as I think, that, but for the prohibition of the annexation act, the city might extend its own mains into this territory, and compete in water business with this company, simply because it is now within the city limits, and has general authority, under other laws, to extend those mains generally throughout the city. I think it will aid us if we consider the question upon just this hypothesis, viz. that the annexation act contained no such prohibition. Could the city, in view of this water company's franchises and contracts, lawfully enter this territory, and set up a rival water business, if no prohibitory provisions were found in the annexation act? In my opinion it could not lawfully have done so, and could and ought to have been restrained from any such attempt by injunction. This conclusion is sustained by common sense and plain business, as well as legal considerations, which would prevail if the same question had arisen between individuals. We may note, in the first place, that, as to this territory, the city is the mere successor of this town. It has paid nothing for the acquisition, and, even if it had, the existence of this water company and its contract with the town were matters of which the city had full notice and knowledge at that time. Hence, upon plain business rules, it has no greater rights than the town had against this company. What, then, were the reciprocal obligations between the company and the town? The answer to this question involves a brief statement of the history of this company. As we proceed, let us keep our eye upon this point,—that the company is simply an artificial person existing only under the act of this town, to the end that by means thereof the town might induce individuals to furnish money with which to build and establish waterworks in the town, for its benefit and that of its inhabitants, as an ordinary business enterprise, for the sake of the business profit to be derived therefrom. As already observed, the town had no power to build waterworks and engage in the business of purveying water. It and its inhabitants dwelling in certain localities needed modern water facilities. Under the general act of 1873 (chapter 737) each town and village in the state was authorized to establish a water company, and then to make a contract with the company thus created. The modus operandi was that not less than a certain number of individuals should sign a paper proposing to organize such a company, which should state the amount of the proposed capital, the proposed term of corporate existence, the proposed source of water supply, etc. This paper was to be submitted to certain officers of the town, viz. the supervisor, the town clerk, three justices of the peace, and the commissioners of highways. The paper was to contain a request that the said town or village authorities shall consider the application of said company "to supply said town or village of this state, or the inhabitants thereof, with pure and wholesome water." Observe it was not to supply

a part of the town, or a part of its inhabitants, with water. If these officers were satisfied with the proposal, they could grant the application, and thereupon the individual promoters could go on and complete their organization as a corporate body, for the special purposes thus specified; but, if these officers disapproved of the proposal, the matter was ended. This water company was organized in the town of New Lots in precisely that way. It must therefore be plain that the company was really the creation of the town, gotten up and existing for the simple purpose of enabling the town to make a bargain with it to purvey water in the town.

Let us now consider a few things which are necessarily implied in this business thus far. Why the necessity of resorting to this mode of accomplishing the result? The answer is that that was the only method then allowed by law for the accomplishment of such results. But why such a law? The answer is, because the nature of the business was such that the consumers, and not the inhabitants, of a town were to be benefited. Perhaps the great majority of the inhabitants of a rural town might never use water thus purveyed; hence it would not be fair for a town to raise money by taxation or assessment upon all its inhabitants to build waterworks which were likely to be used only by a few. The legislature therefore recognized the fact that the improvement must be secured, if at all, through some form of individual enterprise; and, again, that the expense of constructing the plant was necessarily so great that individuals would be slow to undertake such work upon private individual responsibility, and that the desired result would be more easily, certainly, and speedily accomplished through a corporation, in which individuals might risk only such sums as they put in. Hence the law under which this company was organized. It was deemed by the legislature, in its wisdom, the best practical method of accomplishing the desired results.

We may now pause to note a few points which were raised in the argument. In the first place, this corporation and its rights did not result from special legislation. It was organized under a general law, which applied to every town and every village in the state. All the powers which it derives from the law are possessed by every other like corporation. If this company possesses any special or peculiar rights, they have their root, not in the law, but in the contract which the town was authorized to make with this artificial person, which it thus created, or at least helped to create. Hence, no objection or criticism can be made on this company's franchise or contract on the theory of special legislation. We are now considering the case irrespective of the annexation act; but that act granted no special rights or privilege to the water company at all. In effect, it simply said to the city of Brooklyn, "You may annex the territory, but you must not try to interfere with the contracts of the town now existing." While it granted nothing to the water company, it was nevertheless a significant legislative recognition of the validity of the water company's franchises for its whole term. Ziegler v. Chapin, 126 N. Y. 343, 27 N. E. Rep. 471.

In the next place, the whole scheme of accomplishing the re-
sults through a corporation was simply a form of law by which the
town might induce individuals to furnish capital to be expended
in the town under such circumstances that it could never be re-
covered except by carrying out the scheme thus contemplated
through the contract, which was the chief object and end of the
organization of the company.   In other words, an individual in-
vestor could never hope to get his money back, much less any profit
thereon, except through the income arising from water rates to
be collected for furnishing water.   In the next place, the very
nature of the case indicates that such a plant could never be self-
sustaining from the first.   Hence the company must necessarily
have a long term, so that its profits, reasonably expected in the
latter part of the term, might make up losses necessarily antici-
pated at the beginning.   In the next place, the nature of the busi-
ness necessarily implied that the company should be protected
from rivalry during the specified term.   The whole scheme grew
out of the desire of the town to coax investors to put their money
into the plant through the corporation, because of the legal and
financial inability of the town to secure the results for itself alone.
Hence it is obvious that there could have been no reasonable hope
of securing such an investment by individuals, if these town au-
thorities were free to permit a rival to enter the field so soon as
the money, skill, and labor of individuals, exercised through the
company, had demonstrated the success of the enterprise.   These
officers were elected at every town meeting, and it is wholly un-
likely that much progress could ever have been expected in a matter
of this nature, if it depended upon the political complexion of a
board liable to annual changes; hence the phraseology of this
law that there might be "an application," not several applications,
from time to time, for a "waterworks company," not several com-
panies from time to time, "to supply said town," not to parts there-
of, "or the inhabitants thereof," not a part of the inhabitants there-
of, with water.   In the next place, there was a plainly implied trip-
artite contract obligation between the state, the town, and this
company.   Observe the marked distinction between this class of
corporations and others.   What other corporations for private
business purposes are dependent for their franchises upon the will
of local authorities?   They exist by special charter, or, except for
insurance and special business, by simple will of the organizers.
Any proper number of individuals who comply with the general
laws by filing proper papers in the office of the secretary of state,
ipso facto, become invested with corporate rights.   Nobody has
power to withhold the franchises, not even the secretary of state.
Here, however, the town authorities are masters of the situation
in the first instance.   The general principle is that all corporate
franchises involve an implied contract relation with the state.   Peo-
ple v. Sturtevant, 9 N. Y. 273; Mayor, etc., v. Second Ave. R. Co., 32
N. Y. 272; Milhau v. Sharp, 27 N. Y. 616.   Hence there was an im-
plied obligation between this company and the town and its in-

habitants to do the things authorized by this charter, and the state was a party to it. The fundamental idea underlying this town water company law is that the company may have its franchise and exist as a corporation provided the town and the company, or its organizers, agree that it shall exist. The essential or fundamental element is the agreement between the town and the organizers of the company, or the company itself, for this private enterprise. It seems to me, therefore, that this law contemplated two fundamental points: (1) That this franchise of these town water companies should be born of, and should exist only as the result of, contract relation between the town and the company; and (2) that the company when formed should have the exclusive right to the special privileges which the town was authorized to grant —First, the sole right to corporate existence for that purpose; and, second, the sole right to use the streets of the town for its pipes, etc. This did not exclude individuals from the use of their old wells, or from digging new ones, for their own use or that of their neighbors, or from peddling water if they could make anything out of it. It did exclude any other corporation from engaging in the business in that town, and did exclude anybody from interfering with the streets of the town, in order to lay pipes for the purpose of distributing water.

It may be observed that the commissioners all admit that good faith and fair dealing required that the town should not permit competition in the business until the company should at least be reimbursed for its outlay. I fully agree that such an obligation arose certainly in making the contract contemplated by this law; but I cannot understand the theory upon which the commissioners have limited this obligation to mere reimbursement. Let us consider this point carefully, because it is the marrow of the case. The statute certainly contemplated that a contract or contracts of some sort should be made between the company and the town authorities for the establishment of "rates and cost to consumers." Section 5. This, of course, involved just what the power to contract always involves,—the fixing of any terms and conditions which may be agreed on by the contracting parties. The town authorities and this company then made the contract in question, the main feature of which is that the company bound itself to furnish water for public and private use in certain prescribed localities at certain rates, viz. the same rates established for like service in the city of Brooklyn. Now it seems to me that the commissioners decided the case the moment they conceded that any obligation of good faith and fair dealing arose at all to exclude competition. That was all there was of the case. If the obligation existed at all, it was predicated upon, indeed, sprang from, the character of service and contract relation contemplated by this statute. That obligation of good faith and fair dealing was therefore a part of the contract; indeed, the marrow and substance, the very essence, of the contract. It extended not only to the company itself, but to all persons who should invest in the capital or

the bonds of the company for the purpose of raising the money capital for building these works. The essential idea of a corporation for such a purpose is that it may and will do that which corporations for such purposes usually do,—invite the public to purchase its stock and bonds, and deal in them, as one of the common and ordinary means of carrying on such enterprises. Hence this obligation of good faith and fair dealing, which the commissioners have found, extends to outside investors, as well as to the company. Of course I do not mean that the town became in any sense the guarantor of the company's obligations to outsiders, but I do mean that good faith and fair dealing would be a misnomer if the town could do an act which would necessarily deprive this company of the legitimate means of paying its honestly contracted debts, or itself of the fruits of its investment; by which I mean the fair value of the earning capacity of its business. To hold otherwise would be to say that this franchise and the contract were worth nothing at all, and constituted a mere license or privilege, revocable at will, and that it is inconsistent with any obligation at all, either legal or moral, on the part of the town. So, too, it seems to me that this obligation extends to the full term of the company's charter,—certainly to the full period of its subsequent written contract with the town. As already observed, this was no charity, no mere benefaction to this town. It was a matter of business, for ordinary business profit. The monopoly in the chance of the profit was just as much within the obligations of good faith and fair dealing as the chance of getting back the original investment. The capital never could have been raised without the investor's faith in his right to realize profit. The act of disappointing him in the realization of that business profit, and the consequent right to the continuance of this franchise, and the contract fixing rates under it, for the purpose of earning that profit, would therefore seem to be just as much a violation of good faith and fair dealing as the act which should take away his chance of getting back his capital. The court of appeals seems to have settled that principle in the case of People v. O'Brien, 111 N. Y. 1, 18 N. E. Rep. 692. In this case the legislature, for well-known reasons, dissolved the corporation of the Broadway Surface Railroad Company, and the "material question for discussion," as the court says, (page 34, 111 N. Y., and page 696, 18 N. E. Rep.,) was "whether the franchise to maintain tracks and run cars in Broadway survived the dissolution of the corporation." The court of appeals says:

"When we consider the mode required by the statutes and the constitution to be pursued in disposing of this franchise, the inference as to its perpetuity seems to be irresistible; for it cannot be supposed that either the legislature or the framers of the constitution intended to offer for public sale property the title to which was defeasible at the option of the vendor, or that such property could be made the subject of successive sales to different vendors, as often as popular caprice might require it to be done. Neither can it be supposed that they contemplated the resumption of the property, which they had expressly authorized their grantee to mortgage and otherwise dispose of, to the destruction of interest created therein by their consent. We are there-

fore of the opinion that the Broadway Surface Railroad Company took an estate in perpetuity in Broadway, through its grant from the city, under the authority of the constitution and the act of the legislature. It is also well settled by authority in this state that such a right constitutes property, within the usual and common signification of that word. Railroad Co. v. Kerr, 72 N. Y. 330; People v. Sturtevant, 9 N. Y. 263. When we consider the generality with which investments have been made in securities based upon the corporate franchises throughout the whole country, the numerous laws adopted in the several states providing for their security and enjoyment, and the extent of litigation conducted in the various courts, state and federal, in which they have been upheld and enforced, there is no question but that, in the view of legislatures, courts, and the public at large, certain corporate franchises have been uniformly regarded as indestructible by legislative authority, and as constituting property in the highest sense of the term. It is, however, earnestly contended for the state that such a franchise is a mere license or privilege enjoyable during the life of the grantee only, and revocable at the will of the state. We believe this proposition to be entirely repugnant to justice and reason, but contrary to the uniform course of authority in this country. The laws of this state have made such interest taxable, inheritable, alienable, subject to levy and sale under execution, to condemnation under the exercise of the right of eminent domain, and invested them with the attributes of property generally."

It thus seems plain that since this town was estopped by its obligation of good faith and fair dealing from doing or permitting any act which would permit rivalry in this business, the city, which was its mere successor, ought, in common honesty, to be bound by a similar obligation, and to precisely the same extent. If the town could not lawfully permit any other water corporation to enter this territory, how could it lawfully permit the municipal corporation, which exercises its water purveying functions as a mere private business, to enter the field? The obligation on the part of the town to exclude competition did not grow out of its want of power to erect waterworks itself, but out of the implied contract which it made when it granted this franchise, and the subsequent written contract which it made, fixing rates, etc. Hence a mere act enlarging the city boundary cannot justify the inference of a purpose on the part of the legislature to evade, or allow the town to evade, its contract obligations to this company. No one would think of applying such a rule to any other obligation of the town. It therefore follows that if the annexation act had contained no prohibition at all against the city, it would have been a violation of good faith, nay, of common honesty, for it to have attempted to enter the territory, and set up a water business in rivalry with this company.

We come, then, to consider the force and effect of these prohibitions. It is said that they were repealable. But what of that? Their adoption gave no new rights. Hence it is certain that their repeal could take no rights away. In my view they stand as plain legislative recognition of the nature and character of this company's rights in and against this town. Since these rights to the franchise itself rested in the contract between the company and the town, they were unrepealable because of the limitations, not only of the state constitution, but of a fundamental provision of the federal constitution. These rights constitute well-

recognized permanent property, which could not be taken for even public use, much less for use in this private water business, without just compensation. So, too, the attempt to avoid them by mere legislation would have been to impair the force, effect, and validity of a contract. I regard these conclusions as fully sustained by authority. Trustees v. Woodward, 4 Wheat. 518; People v. O'Brien, 111 N. Y. 149, 18 N. E. Rep. 692; Sloan v. Railroad Co., 61 Mo. 24. In this view the prohibitions of the annexation act against the city are plain recognitions of the inviolability of these rights, especially of the character of this franchise. Hence the commissioners proceeded on an erroneous theory when they attempted to appraise them on the hypothesis that they were repealable, or not exclusive; and, since they have themselves certified that their award for these particular rights is for a materially less sum than they would have awarded upon the theory of their exclusiveness and permanency, it follows that their error involves substantial injustice to this company. The result is their award cannot be affirmed. Nor can I, after careful reflection, discover anything in conflict with these inferences in Charles River Bridge v. Warren Bridge, 11 Pet. 420; Oregon Ry. & Nav. Co. v. Oregonian Ry. Co., 130 U. S. 1, 9 Sup. Ct. Rep. 409; or Stein v. Water Supply Co., 141 U. S. 67, 11 Sup. Ct. Rep. 892. On the contrary, the cases cited in the latter seem to me to sustain, rather than refute, the view which I have taken of this franchise, etc.

It seems to me that there can be no two sides to this question, either in reason or authority. The city of Brooklyn, if it desires to acquire property for a private speculation, must pay the owners just compensation, i. e. what it is worth in dollars and cents to such owners. This view is so clearly in accord with all the judicial decisions in this country that not a case holding otherwise is cited by the counsel for the petitioner upon their brief. In conclusion I may add that the annexation act and the decisions of the court of appeals treat the company as in exclusive possession of the territory of the town during the term of its charter. They treat such possession as lawful, and entitled to protection against its only possible peril. These successive legislative and judicial interpretations of the company's position are in accord with the policy of the state. They do not in any way contravene that provision of the state constitution which forbids the passage of a local or private bill granting an exclusive franchise. Neither do they contravene the constitutional provision that general and special acts passed for the formation of corporations may be altered from time to time or repealed. This latter provision prepared the way for new legislation, but does not authorize the impairment of any contract made under existing law.

We come, then, to the question of the practical disposition of the case. As already observed, the court has a power to correct their error in the matter of valuation. Under the act of 1892 the court must confirm or set aside the award. The power to appraise resides in the commissioners. I reach this conclusion re-

luctantly, because of the expense of a new hearing. But this embarrassment is the fault of the statute. The question then recurs, "Shall the case be referred back to the old commissioners, or shall new ones be appointed?" I have concluded that the anal-ogies of ordinary practice require the appointment of new commissioners. Certainly no one would think of sending so important a matter back to the same jury which had once passed upon it, even if that were practicable; and any juror who had once joined in a verdict would be excluded in a new trial of an ordinary case.

This opinion is necessarily long, for the reason that I have not had time to condense it, and I have yielded to a desire to make it so plain that any person of ordinary intelligence can understand it fully,—can be convinced, as I am, that reason and authority both leave no other alternative but the one herein indicated. Several other points are raised by the defendants, but they are of minor importance, and need no comment.

Since the foregoing was written, my attention has been called to the exhaustive opinion of Mr. Justice Brewer in Monongahela Nav. Co. v. U. S., decided by the United States supreme court March 27, 1893, (13 Sup. Ct. Rep. 622,) which covers most of the points already discussed. Here was an express act of congress not to value the franchise. It is well held that the value of property taken in such a proceeding as this is a judicial, and not a legislative, question. Here was an attempt to take a franchise under a federal right of eminent domain, which is superior even to that of the state, and yet his honor truly puts it thus:

"The franchise is a vested right. The state has power to grant it. It may retake, as it may take, any other private property for public use, upon the payment of just compensation. A like, though superior, power exists in the national government. It may take it for public purposes, and take it against the will of the state, but it can no more take the franchise which the state has given than it can take any private property belonging to an individual."

And, again, in closing the opinion:

"Our conclusion is that with the ownership of the tangible property, legally held in this place, the company also has a vested right to receive tolls for its use. But such franchise is as much a vested right of property as the ownership of the tangible property; but the right of the national government, under its grant of power to regulate commerce, to condemn and appropriate this land, then belonging to the navigation company, is subject to the limitations imposed by the fifth amendment,—that private property shall not be taken for public use without just compensation; that such just compensation requires the payment for the franchise to take tolls, as well as for the value of the tangible property; and that the assertion by congress of its purpose to take the property does not destroy the state franchise."

If all this may be held of a power which is superior to that of the state legislature, what remains to be said to belittle the value of this company's franchise on the theory that it may be repealed?